MARTHA McGUIRE, Plaintiff, *v.* THE TRAVELERS INSURANCE COMPANY, Defendant.*

City Court of New York, Trial Term, Bronx County, February 10, 1938.

* Modfd., 167 Misc. 718.

*Maxwell M. Booxbaum*, for the plaintiff.

*John G. Donovan*, for the defendant.

DONNELLY, J.   The policy involved herein is not for the payment of a so-called double indemnity when the death of the insured is the result of injuries caused by external, violent, accidental means. The action is upon a policy of insurance in the sum of $2,000 issued upon the life of James P. McGuire, payable upon his death to the beneficiary, his widow, who is plaintiff.   The estate of the insured could not have been enriched by his suicide.

The policy contains the provision: " If the insured shall commit suicide while sane or insane within two years from the date of this contract, the limit of recovery hereunder shall be the premiums paid."

Payment is resisted by defendant upon the ground that the death of the insured was the result of suicide.

At the time of his death, on June 16, 1937, the insured was twenty-nine years of age.   He was five feet seven and one-half inches in height, and he weighed 150 pounds.   He had been a fireman in the employ of the fire department of the city of New York.   He was married to the beneficiary June 18, 1933.   At the time of his death his wife shortly was to become a mother.   The child was born two weeks after his death.

For about two weeks before his death the insured was a patient afflicted with sarcoma at The Home for Incurables, located in Bronx county.   At the institution just named he was the sole occupant of a room on the fourth floor of one of the home's buildings.   The room is fifty-six feet two inches above the cement driveway.   This room has two windows looking out on the space below, which is the driveway; each window was screened on the outside; the windows are thirty-five and one-half inches above the floor of the room; the bed in the room was six or seven feet from the windows.   There was a tree outside, the center of which was sixteen feet five inches from the building.   Part of the branches of the tree are under the window through which the insured fell. From the photograph, Defendant's Exhibit 1, these branches appear to be close to the building.

A few minutes after midnight on June 16, 1937, the body of the insured was found on the cement driveway at a point indicated by one of the defendant's witnesses as twenty feet out from the base of the building and by another witness, called by the defendant, at a point fifteen feet out from said base.   Near the body of the insured were found some branches broken from the tree.   After

the discovery of the body the screen on the window on the right-hand side of the room as one enters it was seen swinging outward. This is the window nearest the tree.

Two points are urged by the defendant in support of its contention that the death of the insured was due to suicide: (1) Insured knew he had an incurable disease and had not long to live. (2) The distance of his body from the base of the building eliminates the possibility that he fell.

In *Weil* v. *Globe Indemnity Co.* (179 App. Div. 166), which was an action upon an accident insurance policy, it was said: " The plaintiff's case was duly established *prima facie*, supported by the well-established presumption, that where the cause of death was either accident or suicide, and there is no evidence explaining the cause, the law presumes that the death was accidental." *Martorella* v. *Prudential Ins. Co.* (268 N. Y. 586) involved a claim for ordinary life insurance only. In that case a verdict in favor of plaintiff was unanimously affirmed. There the trial court charged that the burden of proof on the issue of suicide was upon the defendant, and left it to the jury to determine whether the defendant had established by a fair preponderance of evidence that the death of the insured was the result of suicide. The weight of the evidence is that the insured was unaware of the malignant character of his ailment and of the imminence of his death. Even though he had been cognizant of an incurable disease, his awareness of itself would not be conclusive of a suicidal purpose. On the night of his death he was comfortable, even cheerful, remarked to his visitors that as soon as they left it was his intention to tune in on the " Amateur Hour," a skit which seemed to amuse him, and on the same night he was vocally eager to get home to greet the baby his wife was expecting.

There was no eye witness to the manner in which the insured got from his room to the point where his body was found. On the night he died it was quite warm. Before his death each of the two windows in his room was probably open. It is definitely established that before his death the window in his room from which the screen was seen swinging outwardly after his body was found was open. No witness was called who testified definitely to the condition of the window screens before the body of the insured was found. In this respect the instant case is identical with the situation regarding the window screen in *Shtevelan* v. *Metropolitan Life Ins. Co.* (162 Misc. 835, unanimously affirmed by Appellate Term, N. Y. L. J. Dec. 9, 1937, p. 2075).

In the instant case, as in the case just cited, to say that the screen was secured and that the insured deliberately unfastened

it so as to give him an opening through which he jumped to his death is mere conjecture. It is just as reasonable to infer that the death of the insured was due to accidental means as it is to surmise that he committed suicide. About four-twenty o'clock in the morning of June 11, 1937, the insured fell out of his bed after having taken luminal, complained of shortness of breath, drank a great deal of water and voided frequently. So far as the record shows, the last one to see the insured alive was the orderly. Some time between ten and eleven o'clock on the night of the death of the insured, the orderly found him in his bathroom, assisted him back to his bed and told him it was dangerous for him to get out of bed without assistance as he might hurt himself if he fell in his weakened condition. In the absence of any evidence to show a motive for self-destruction or of expressions indicating a suicidal tendency, or of circumstances that only the insured could have created the opportunity for a deliberate jump, it does not strain credulity to believe that insured left his bed to catch his breath by the window, leaned upon the sill or sat upon the sill or arm of the wicker chair by the window, became dizzy and fell against the screen, which swung open, causing him to fall to the ground below.

There may be circumstances which impel the inference of suicide. Two cases are cited by defendant to illustrate this. (*Unger* v. *New York Life Ins. Co.*, 210 App. Div. 80; *Lindblom* v. *Metropolitan Life Ins. Co.*, Id. 177.) In the *Unger* case a witness testified he saw the insured jump head first through an opening in an elevator shaft. Before he jumped the deceased had gone to his knees to look, as he said, for a diamond ring he had lost. There was testimony by another witness that the one who said he saw the jump declared that the deceased either slipped or fell or lost his balance. It was shown that the estate of the deceased was insolvent. Just before his death he telephoned and said to the one he called that if the latter did not come to his office right away it would be too late. In the *Lindblom* case it was held that the evidence as a whole pointed to suicide with certainty. Shortly before his death, and when he was financially embarassed, the insured took out additional life insurance in a large amount. Six weeks before his death he drove his car into a river in circumstances from which it would be difficult to reach any other conclusion than that his purpose was suicide. His death was caused by drinking a quantity of almost pure carbolic acid.

I am unable to agree with defendant's counsel that a reading of the opinion in *McVeigh* v. *New York Life Ins. Co.* (230 App. Div. 136) indicates that the court reversed the judgment in plaintiff's favor solely because the body of the insured was found about

thirty feet out from the base of the building, an apartment house sixty-eight feet high, and also because the parapet wall on the roof rose thirty-eight inches from the floor of the roof. In the case just cited, as at bar, the fall or jump was unwitnessed. The insured had gone to the roof ostensibly to change a clothes line. No circumstances were disclosed from which it may be inferred that he actually did anything in reference to a clothes line. His hat and coat were found on the roof, as were heel prints on top of the projection in the parapet wall, which was four feet nine and one-half inches above the roof, covered with a concrete slab. Moreover, and this may well be preponderant when there is no direct testimony of accident or design, there was evidence in the *McVeigh* case indicative of a suicidal tendency by the insured. When these circumstances are considered, the most that can be said of the position of the body is that it was an additional fact sufficient to rebut the presumption of accidental death. At bar, the position of the body of the insured may be accounted for by the supposition that as he fell his body struck the tree and was deflected. From the proximity of the tree and its branches with reference to the window it is difficult to perceive how his body could avoid coming in contact with the tree. The broken branches near the body are mute witnesses of the contact. A physician called by defendant testified it would be possible that a falling object which struck the tree would be deflected by it. If this testimony must be ignored as mere conjecture the fact remains there was no evidence to show a jump with suicidal intent on the part of the insured.

Judgment for plaintiff in the sum of $2,000, with interest thereon from the 16th day of June, 1937; exception to the defendant. Ten days' stay and thirty days to make and serve case.